IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| MATEJ SVOBODA, | ) | 4:08CV3124 |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM** |
| v. | ) | **AND ORDER** |
| | ) | |
| TRI-CON INDUSTRIES, LTD., | ) | |
| | ) | |
| Defendant. | ) | |

The plaintiff, Matej Svoboda, alleges that his employment was terminated by the defendant, Tri-Con Industries, Ltd., in willful violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 to 2654. Tri-Con has filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, contending the action is barred by the statute of limitations. The motion will be granted.

## I. BACKGROUND

A civil action may be brought under the FMLA "not later than 2 years after the date of the last event constituting the alleged violation for which the action is brought[,]" except that an "action for a willful violation of . . . [the Act] . . . may be brought within 3 years of the date of the last event constituting the alleged violation for which such action is brought." 29 U.S.C. § 2617 (c)(1),(2). Tri-Con terminated Svoboda's employment on June 29, 2005, when he did not return to work after being on FMLA leave. The present action was filed on June 11, 2008. Whether the filing was timely thus depends on whether there was a "willful" violation of the Act.[1]

---

[1] Tri-Con previously attempted to raise this issue on a motion to dismiss. I denied the motion after declining to consider any matters outside the pleadings, *see* Federal Rule of Civil Procedure 12(d), and upon finding that Svoboda's conclusory

## *II. DISCUSSION*

"Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law." *Chial v. Sprint/United Management Co., 569 F.3d 850, 853 (8th Cir. 2009)*. "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

Under the court's local rules, "[t]he moving party must include in the brief in support of the summary judgment motion a separate statement of material facts about which the moving party contends there is no genuine issue to be tried and that entitles the moving party to judgment as a matter of law." NECivR 56.1(a)(1). "The statement of facts should consist of <u>short</u> numbered paragraphs, each containing pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials that support the material facts stated in the paragraph." NECivR 56.1(a)(2) (emphasis in original). "The party opposing a summary judgment motion should include in its brief a concise response to the moving party's statement of material facts. The response should address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. <u>Properly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response.</u>" NECivR 56.1(b)(1) (emphasis in original).

Tri-Con has complied with Nebraska Civil Rule 56.1 by including in its supporting brief a 48-paragraph statement of material facts, with detailed references

---

allegation of a willful violation was sufficient under Federal Rule of Civil Procedure 9(b). *See* Memorandum and Order entered on October 27, 2008 (filing 26).

to the record.  Svoboda has not made a concise response to this statement in his opposing brief.  Instead, Svoboda has prepared his own 30-paragraph statement of facts in which most of the material facts stated by Tri-Con are specifically admitted through repetition.  While I will give due consideration to any additional facts that are properly referenced in Svoboda's statement, *see Jenkins v. Winter*, 540 F.3d 742, 747 (8th Cir. 2008) (holding that district court erred in not considering statement of facts presented in opposition to summary judgment motion), Tri-Con's statement of material facts, to the extent it is supported by the record, will be deemed admitted because none of the facts are controverted in Svoboda's response.[2]

## A.  Material Facts

The undisputed facts are these:

1. On February 24, 2004, Plaintiff began working for Tri-Con as a tool and die apprentice. (*Tri-Con Ex. 1* [Filing 41-2]*: Deposition of*

---

[2] *See, e.g., Ballard v. Heineman*, 548 F.3d 1132, 1133 (8th Cir. 2008) ("We follow the district court in considering [the defendants'] statements of fact in support of their motions for summary judgment 'deemed admitted' under Nebraska Local Civil Rule 56.1(b) because [the plaintiff] did not respond to those statements of fact."); *Libel v. Adventure Lands of America, Inc.*, 482 F.3d 1028, 1033 (8th Cir. 2007) (district court was not obliged to scour record looking for factual disputes and did not abuse discretion in deeming admitted moving party's statements of undisputed facts where opposing party's responses violated Iowa Local Rule 56.1); *Jones v. United Parcel Service, Inc.*, 461 F.3d 982, 991 (8th Cir. 2006) (district court did not abuse discretion in deeming admitted defendants' uncontroverted facts where plaintiff's response violated W.D. Missouri Local Rule 56.1; district court was not required to give specific notice of rule violation before disregarding the response); *Northwest Bank and Trust Co. v. First Illinois Nat'l. Bank*, 354 F.3d 721, 725 (8th Cir. 2003) (district courts may adopt local rules designed to streamline resolution of summary judgment motions).  *See also Cordray v. 135-80 Travel Plaza, Inc.*, 356 F.Supp.2d 1011, 1014-15 (D.Neb. 2005) (granting summary judgment based in part on opposing party's failure to address each numbered paragraph of moving party's statement of material facts).

*Matej Svoboda ("Plaintiff Dep."), 16:23-17:2; Tri-Con Ex. 14* [Filing 41-15]: *Affidavit of Shelley Holt ("Holt Aff."), ¶3).*[3]

2. Upon or immediately prior to commencing employment with Tri-Con, Plaintiff received from Tri-Con's Human Resources Department the Associate Handbook, which contained the terms of Plaintiff's employment and Tri-Con's policies. (*Tri-Con Ex. 2* [Filing 41-3]: *Tri-Con's Associate Handbook (Plaintiff Dep. Ex. 1); Plaintiff Dep. at 19:5-25, 22:9-22, 29:7-9; Holt Aff., ¶4).*[4]

3. Tri-Con's Associate Handbook contained an Attendance Policy, which provided, "It is the Associate's responsibility to advise Tri-Con . . . through the Associate Report-off recording when you intend to be absent from work." (*Tri-Con Ex. 2, at §704*).

4. Tri-Con's Associate Handbook also contained an FMLA Policy, which mirrors and was drafted to comply with the FMLA. (*Id., at §524; Holt Aff., ¶6*). Tri-Con's FMLA Policy provides that employees were entitled under the FMLA for up to twelve weeks of leave in a twelve-month period "where the [employee's] own serious health condition precludes the [employee] from performing the functions of his or her own job." (*Id.*).[5]

---

[3] Svoboda admits he "began working for Defendant, Tri-Con ('Defendant') as a tool and die apprentice on February 24, 2004. (*Defendant Ex. 1: Deposition of Matej Svoboda ("Svoboda Dep."), 16: 23-17:2; Defendant Ex. 14: Affidavit of Shelley Holt ("Holt Aff."), ¶ 3).*" (Plaintiff's Brief (filing 45), Statement of Facts ("Plaintiff's Facts"), ¶ 1.)

[4] Svoboda admits he "received from Tri-Con's Human Resources Department the Associate Handbook, which contained the terms of Svoboda's employment and Tri-Con's policies. (*Defendant Ex.2: Tri-Con's Associate Handbook; Svoboda Dep. at 19: 5-25, 22:9-22, 29: 7-9; Holt Aff., ¶ 4).*" (Plaintiff's Facts, ¶ 2.)

[5] Svoboda agrees that "Tri-Con's Associate Handbook contained an FMLA policy, which provides that employees were entitled up to twelve weeks of leave in a twelve-month period 'where the [employee's] own serious health condition precludes him or her from performing the functions of his or her own job.'

5. Tri-Con's FMLA Policy requires "certification by a healthcare provider if the [employee's] medical condition prevent[ed] him or her from performing the duties of his or her position." (*Id.*).[6]

6. Tri-Con's FMLA Policy further provides that the company would provide to associates entitled to FMLA leave "written notice detailing specific expectations and obligations" of the employee and explaining "the consequence of failing to meet those obligations." (*Id.*). At all times relevant to this action, in accordance with Tri-Con's FMLA Policy Tri-Con gave associates who requested FMLA leave a request for family medical leave form, a leave of absence form, and Tri-Con's response to the leave request. (*Holt Aff., ¶7*).

7. Plaintiff reviewed the Associate Handbook, understood its terms, agreed to comply with the terms and conditions of employment as contained in the Handbook, and retained a copy of the Handbook during his employment with Tri-Con. (*Tri-Con Ex. 3* [Filing 41-4]*: Acknowledgment of Receipt of Handbook (Plaintiff Dep. Ex. 2); Plaintiff Dep. at 20:16-23:8, 59:15-17; Holt Aff., ¶5)*. Plaintiff specifically understood and was familiar with Tri-Con's Attendance Policy and FMLA Policy. (*Plaintiff Dep. at 24:18-25:12, 30:9-31:10, 32:6-9, 32:24-33:2; 73:7-15*).[7]

8. During his employment, Plaintiff was familiar with and knew where to find Tri-Con's Human Resources Department, and had an opportunity to ask the Human Resources Department questions

---

*(Defendant Ex. 2 at 75).*"  (Plaintiff's Facts, ¶ 3.)

[6] Svoboda also agrees that "Tri-Con's FMLA policy found with the Handbook requires 'certification by a healthcare provider if the [employee's] medical condition prevents him or her from performing the duties of his or her position.' (*Id.*)." (Plaintiff's Facts, ¶ 4.)

[7] Svoboda admits he "reviewed the Associate Handbook, understood and agreed to the terms and conditions. (*Svoboda Dep. at 20: 16-23: 8, 59:15-17; Holt Aff. ¶5)*."  (Plaintiff's Facts, ¶ 5.)

regarding the Associate Handbook and Tri-Con's policies. *(Id. at 29:10-22, 159:20-23)*.

9. Plaintiff considered it important to attend work at Tri-Con regularly, understood he had a duty to keep his employer informed if he was going to miss work, and knew he could be disciplined for failing to attend work. (*Id. at 24:7-15, 25:13-28:6)*.

10. On May 23, 2005, Plaintiff was involved in a car accident and claimed he was injured. (*Filing No. 1* [Complaint], *¶7; Filing No. 27,* [Answer] *¶3; Plaintiff Dep. at 33:5-6).*[8]

11. At the time of his accident, Plaintiff was living with his parents and younger sister at 1718 378th Street, Seward, Nebraska 68434 ("Seward Address"). (*Plaintiff Dep. at 8:11-18, 37:4-8*).[9]

12. The Seward Address was the only address Plaintiff provided to Tri-Con during the course of his employment as a means to contact him if necessary. (*Id. at 39:22-40:16, 108:21-109:12; Tri-Con Ex. 4* [Filing 41-5]: *Plaintiff's Answers to Defendant's Interrogatories, No. 3)*.

13. Plaintiff took a leave of absence from work beginning on or about May 24, 2005. (*Holt Aff., ¶8*).[10]

14. Following his accident, Plaintiff, with the assistance of his father, visited Tri-Con in person on June 8, 2005, and requested an

---

[8] Svoboda elaborates: "On May 23, 2005, Svoboda was involved and injured in a car accident (*Svoboda Dep. at 33: 3-6*)." (Plaintiff's Facts, ¶ 6.) "As a result of that accident, Svoboda suffered a concussion, fatigue, chest pains, difficulty walking, as well as physical therapy (*Id. at 33: 9-34:5*)." (Plaintiff's Facts, ¶ 7.)

[9] Svoboda confirms he "was living with his parents and sister at 1718 378th Street, Seward, Nebraska, 68434 at the time of the accident (*Svoboda Dep. at 9:6-10*)." (Plaintiff's Facts, ¶ 9.)

[10] Svoboda agrees he "took a leave of absence from beginning on May 24, 2005 (*Holt Aff. ¶ 8*)." (Plaintiff's Facts, ¶ 8.)

absence from work due to a "serious health condition." (*Filing No. 1, ¶¶ 7-8; Filing No. 27; Plaintiff Dep. at 42:25-43:16; Holt Aff., ¶9*).[11]

15. In support of his request, Plaintiff and his father submitted a typed letter to Tri-Con indicating that Plaintiff wanted to take a leave of absence from work and that his return to work would be based on his doctor's release. (*Plaintiff Dep. at 44:2-45:8, 47:4-48:11, 48:21-49:12*). Plaintiff's letter to Tri-Con was dated June 8, 2005, and bore Plaintiff's name and the Seward Address. (*Id.*).[12]

16. Tri-Con openly suggested that Plaintiff take FMLA leave, did not try to hide the fact that Plaintiff was entitled to such leave, and worked with him in accommodating his request for FMLA leave. (*Id. at 52:12-17, 158:21-23; Holt Aff., ¶15*).

17. On or before June 8, 2005, Tri-Con provided Plaintiff and his father with paperwork for Plaintiff and Plaintiff's doctor to fill out to approve his request for FMLA leave. (*Id. at 52:4-20, 53:1-3; Holt Aff., ¶10*).[13]

---

[11] Svoboda explains: "Because Svoboda was still injured from his car accident, his father went to Tri-Con on June 8, 2005 and requested an absence from work due to a 'serious health condition.' (*Filing No. 1 ¶¶ 7-8; Filing No. 27; Plaintiff Dep. at 42; Holt Aff. at ¶ 9*). Svoboda was unable to go into Tri-Con, however Shelly Holt ('Holt') stopped by his car to check in on him. (*Holt Dep. at 26:14- 27:7*)." (Plaintiff's Facts, ¶ 10.)

[12] Svoboda agrees that "[he] and his father submitted a typed letter, dated June 8, 2005, to Defendant requesting a leave of absence and that his return to work would be based on his doctor's release. (*Svoboda Dep. at 44:2-45: 8, 47: 4-48:11, 48:21-49:12*)." (Plaintiff's Facts, ¶ 11.)

[13] This statement is admitted, as Svoboda states: "On or before June 8, 2005, Defendant provided Svoboda and his father paperwork for Svoboda and his doctor to fill out in order to approve his request for FMLA leave. (*Id. at 52: 4-20, 53: 1-3; Holt Aff., ¶10*)." (Plaintiff's Facts, ¶ 12.)

18. Included in the FMLA paperwork received and completed by Plaintiff were three documents. The first document was a "Request for Family Medical Leave (FMLA)" ("Request"). (*Tri-Con Ex. 5* [Filing [41-6]*: Request for Family Medical Leave (Plaintiff Dep. Ex. 6); Plaintiff Dep. at 53:14-56:24)*. The Request provided that beginning May 24, 2005 (the day after Plaintiff's car accident), Plaintiff "need[ed] to take family medical leave due to a serious health condition that ma[de] him unable to perform the essential functions" of his job." (*Tri-Con Ex. 5*). Plaintiff signed the Request, dated June 8, 2005, and agreed that he understood "that a FMLA physician statement must be provided before FMLA is approved and that it [was his] responsibility to ensure FMLA paperwork [was] received by Tri-Con HR," "that FMLA cover[ed his] absence through 12 weeks of leave," and that if he failed to report to work after the date reported to Tri-Con HR that he would "be considered to have voluntarily terminated [his] employment." (*Id.; Plaintiff Dep. at 54:21-24, 55:9-56:24, 159:7-10).*[14]

19. Plaintiff also received and completed a "Leave of Absence Form." (*Tri-Con Ex. 6* [Filing [41-7]*: Leave of Absence Form (Plaintiff Dep. Ex. 7); Plaintiff Dep. at 57:13-59:17*). The Leave of Absence Form directed Plaintiff to "refer to the [associate] handbook for leave eligibility rules and rights for the type of leave you are requesting." (*Tri-Con Ex. 6; Plaintiff Dep. at 59:9-17*). Plaintiff signed the Leave of

---

[14] This statement is only partially admitted.  Svoboda states: "This paperwork included three documents that were received and completed by Svoboda.  The first document was a 'Request for Family Medical Leave (FMLA)'. (*Defendant Ex. 5: Request for Family Medical Leave; Svoboda Dep. at 53:14-56:24*). This request stated beginning on May 24, 2005 Svoboda 'needed to take family medical leave due to a serious health condition that made him unable to perform the essential functions of his job' (*Defendant Ex. 5)*."  (Plaintiff's Facts, ¶ 13.)

Contrary to Tri-Con's statement, there was no "date reported to Tri-Con HR" on this Request for Family Medical Leave form.  That is, Svoboda did not include a return date, but merely indicated by filling in one date that:  "I need this leave to begin on  5/24/05  and expect it to continue until __/__/__."  (Filing [41-6], at 2.) Below this entry the form stated: "I understand if I fail to report to work after the date given above without contacting Tri-Con HR that I will be considered to have voluntarily terminated my employment."  (*Id.*)

Absence Form, agreeing that "Failure to return to work on the day indicated will constitute self termination unless approved alternate arrangements are made prior to the pre-approved return date . . . ." (*Tri-Con Ex. 6; Plaintiff Dep. at 159:7-10*).[15]

20. The third document Plaintiff received and signed was a "Response for Family Medical Leave" from Tri-Con. (*Tri-Con Ex. 7* [Filing 41-8]: *Response for Family Medical Leave (Plaintiff Dep. Ex. 8) ("Response"); Plaintiff Dep. at 59:18-62:21)*. The Response provided that "[o]n May 24, 2005, [Plaintiff] notified [Tri-Con] of [his] need to take family/medical leave due to . . . a serious health condition." (*Tri-Con Ex. 7*). The Response also provided that Plaintiff was eligible for FMLA leave, was required to furnish medical certification of a serious health condition, and was required to give Tri-Con with [sic] periodic reports of his status and intent to return to work. Plaintiff signed the Response on June 8, 2005, agreeing to its terms. (*Plaintiff Dep. at 70:20-24, 159:7-10*). The Response indicates that a copy was given to Plaintiff. (*Tri-Con Ex. 7, at 2; Plaintiff Dep. at 63:7-9*).[16]

_____

[15] Svoboda only admits the first sentence, stating: "The second document Svoboda received and completed was a 'Leave of Absence Form.' (*Defendant Ex. 6: Leave of Absence Form; Svoboda Dep. at 57: 13-59:17*)." (Plaintiff's Facts, ¶ 14.)
No return date was shown on the Leave of Absence Form. In fact, the form was not completed except to show Svoboda's name and department.

[16] Again, Svoboda only partially admits this statement. He states: "The third document Svoboda received and signed was a 'Response for Family Medical Leave.' (*Defendant Ex. 7: Response for Family Medical Leave; Svoboda Dep. at 59: 18-62:21)*. The response provided Svoboda was eligible for FMLA leave, was required to submit a medical certification of his serious health condition, and for his return of work date it states 'Keep us posted.' (*Defendant Ex. 7)*. Svoboda signed the Response on June 8, 2005. (*Svoboda Dep. at 70:20-24, 159:7-10)*." (Plaintiff's Facts, ¶ 15.)
The Response form does, in fact, contain a handwritten entry, "Keep us posted.", above the blank spaces in paragraph 9: "You will be expected to report for duty at _____ (time) on _____ (date) unless you notify Tri-Con Industries LTD prior to that date that you will need an extension of time and present another medical certification. If you do not return at the above time and date and do not notify the Company of the need for an extension of your FMLA leave and/or do not seek leave

9

21. Finally, Plaintiff and his father received from Tri-Con a "Certification of Health Care Provider," to be completed by Plaintiff's doctor. (*Tri-Con Ex. 8* [Filing 41-9]*: Certification of Health Care Provider (Plaintiff Dep. Ex. 11) ("Certification"); Plaintiff Dep. at 87:9-88:22*). After Svoboda and his father received the Certification on June 8, 2005, either Plaintiff's father or mother dropped off the Certification the same day at Seward Memorial Clinic for Plaintiff's doctor to complete. (*Plaintiff Dep. at 88:23-89:19*).[17]

22. Tri-Con informed Plaintiff and his father about the FMLA leave process, gave them an opportunity to ask questions regarding the FMLA process and Plaintiff's request for FMLA leave, and confirmed completion of Plaintiff's FMLA paperwork. (*Holt Aff., ¶15*).

---

under another company policy, you will be considered to have voluntarily terminated your employment." (Filing 41-8, at 3.)

Another handwritten entry on the Response form indicates that the leave was expected to continue until "yet unknown." (*Id.*, at 1.)

Contrary to Tri-Con's statement, the Response form did not tell Svoboda that he was required to give Tri-Con periodic reports of his status and intent to return to work. The form actually stated: "While on leave, you *may* be required to furnish us with periodic reports of your status and intent to return to work." (*Id.*, at 3 (emphasis supplied).

On the other hand, Tri-Con did specify in the Response form that Svoboda would "be required to present a fitness-for-duty certificate prior to being restored to employment." (*Id.*)

[17] Svoboda agrees that "[t]he last document [he] and his father received from Defendant was a 'Certification of Health Care Provider,' ('Certification') to be completed by Svoboda's doctor. (*Defendant Ex. 8: Certification of Health Care Provider; Svoboda Dep. at 87:9-88:22*). After receiving the Certification on June 8, 2005, Svoboda and his father or mother dropped off the Certification at Seward Memorial Clinic for Svoboda's doctor to complete. (*Svoboda Dep. at 88:23-89:19*)." (Plaintiff's Facts, ¶ 16.)

The Certification form used by Tri-Con was the U.S. Department of Labor's standard form WH-380 (revised December 1999). *See* 29 C.F.R. § 825.306 (2005); 29 C.F.R. Pt. 825, App. B (2005).

23. Plaintiff knew that in order for Tri-Con to approve his request for FMLA leave, he was required to submit certification from his doctor stating that he was unable to work due to a serious health condition. (*Plaintiff Dep. at 32:6-9, 74:8-20*). Thus, after his accident, Plaintiff talked with his doctor about needing such documentation. (*Id. at 92:7-20*).[18] Plaintiff understood that in order for Tri-Con to approve his leave request, the Certification needed to tell Tri-Con precisely how much time Plaintiff needed off from work due to a serious health condition. (*Id. at 71:9-12*).[19]

24. Plaintiff's primary physician at the time of and after his accident was Dr. Jared Ketner ("Dr. Ketner"), who at all relevant times worked at the Seward (Nebraska) Memorial Clinic. (*Id. at 36:6-13*). Plaintiff had a "good relationship" with Dr. Ketner, felt comfortable telling Dr. Ketner about his injuries and symptoms, trusted his doctor's opinion on his medical treatment, and believed Dr. Ketner to be truthful and accurate. (*Id.at 36:14-37:3, 80:11-19*).[20]

25. By June 2005, Plaintiff was not new to the process of submitting documentation from Dr. Ketner to excuse an absence from work at Tri-Con. Plaintiff had previously submitted notes from Dr. Ketner to excuse absences from work and understood that a doctor's note was necessary to approve an absence from work. (*Id. at 83:14-86:1*).

---

[18] Svoboda testified that he spoke to his doctor in May 2005 about needing a note to excuse his absence from work.  He denied speaking to his doctor about completing the Certification form.  (Filing 41-2, at 25-26.)

[19] This misrepresents Svoboda's testimony, which was simply to answer "yes" to this question: "And you also understood that the certification would tell Tri-Con how much time you needed off from work, correct?"  (Filing 41-2, at 20.)

[20] Svoboda agrees that his "primary physician at this time was Dr. Jared Ketner ("Dr. Ketner") who worked at the Seward Memorial Clinic at all relevant times. (*Svboda Dep. at 36:6-13).*"  (Plaintiff's Facts, ¶ 17.)

11

26. Dr. Ketner completed and signed the Certification on June 9, 2005. (*Id. at 94:9-21; Tri-Con Ex. 8*). Tri-Con received the completed Certification in early to mid June, 2005. (*Id. at 98:20-22; Holt Aff., ¶14*).[21]

27. The completed Certification stated that Plaintiff had a serious health condition caused by his motor vehicle accident on May 23, 2005. (*Tri-Con Ex. 8; Plaintiff Dep. at 94:22-95:9*). The Certification further indicated that the duration of Plaintiff's serious health condition was through June 21, 2005, and that Plaintiff would be unable to work until that time. (*Tri-Con Ex. 8*).[22]

28. Based on the Certification, Tri-Con approved Plaintiff's request for FMLA leave beginning May 24, 2005, until June 21, 2005, and expected Plaintiff to return to work on June 22, 2005, or advise Tri-Con of a new return-to-work date at that time. (*Plaintiff Dep. at 124:23-25; Holt Aff., ¶16*).[23] Plaintiff knew that his FMLA leave had been approved by Tri-Con. (*Plaintiff Dep. at 70:25-71:4, 72:23-73:2*).[24]

---

[21] Svoboda agrees that "Dr. Ketner completed and signed the Certification on June 9, 2005. (*Id. at 83: 14-84:1*). Defendant received the completed Certification in early to mid June, 2005. (*Id. at 98:20-22; Holt Aff., ¶14*)." (Plaintiff's Facts, ¶ 17.)

[22] Svoboda only admits that "[t]he completed Certification stated Svoboda has a serious health condition due to his May 23, 2005 car accident. (*Defendant Ex.8; Svoboda Dep. at 94:22-95:0*)." (Plaintiff's Facts, ¶ 18.)
Dr. Ketner stated that Svoboda was "unable to work at all" due to "post concussion symptoms" from the motor vehicle accident. (Filing 41-9, at 2, 3.)

[23] Svoboda's deposition testimony only indicates agreement with the statement that his leave started on May 24, 2005. (Filing 41-2, at 33.)

[24] Svoboda states: "Based on this Certification, Svoboda's FMLA leave was approved by Defendant beginning on May 24, 2005. (*Defendant Ex.7*). No specific date was given for Svoboda to return; the form merely says 'Keep us updated' and furnish certification by June 23, 2005. (*Defendant Ex. 7*)." (Plaintiff's Facts, ¶ 19.)
As discussed above in footnote 16, the "Response for Family Medical Leave" form (Tri-Con's Exhibit 7) contains a handwritten entry, "Keep us posted." The form

29. Plaintiff was relying on the Certification from Dr. Ketner to excuse his absence from work. (*Id. at 107:17-22*). Plaintiff attempts to claim ignorance on the Certification's return-to-work date and alleges he did not see the completed Certification prior to this litigation.[25] However, Plaintiff admits that, in the past, Dr. Ketner relied on Plaintiff to tell him when Plaintiff needed certification excusing his absence from work and that but for Plaintiff talking to Dr. Ketner about the matter, Dr. Ketner wouldn't know Plaintiff needed a note or what information to put in the note. (*Id. at 87:1-8, 95:23-97:10*).[26]

30. Plaintiff admits that "Tri-Con, in processing [Plaintiff's] FMLA leave request, had to rely on the information it received from [Plaintiff's] doctor." (*Id. at 162:3-16*).

31. Plaintiff understood that it was his responsibility to make sure Tri-Con received the Certification from Plaintiff's doctor. (*Id. at 71:5-8*). Despite his knowledge of this responsibility, Plaintiff never called or followed up with Tri-Con to confirm that Tri-Con received all the necessary paperwork to approve his request for FMLA leave. (*Id. at 72:18-22, 99:19-25, 104:15-18*). Nor did Plaintiff ever ask Dr. Ketner

---

advised Svoboda that if he did not furnish certification of his serious health condition by June 23, 2005, Tri-Con could delay the commencement of his leave and count all absences against him under the company's Attendance, Absenteeism, and Tardiness Policy.  (Filing 41-8, at 2.)

On the Certification form (Tri-Con's Exhibit 8), Svoboda's doctor was requested to "[s]tate the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity if different)."  Dr. Ketner responded: "5/23/05 MVA. Off at least through 6/21/05."  (Filing 41-9, at 2.)

[25] Tri-Con's footnotes to this and other statements of fact are not deemed admitted and have been omitted by the court.

[26] Svoboda states he "knew his FMLA leave had been approved by Defendant. (*Svoboda Dep. at 70:25-71:4; 72:23-72:2).*  Plaintiff relied on the Certification from Dr. Ketner to excuse his absence from work. *(Svoboda Dep. at 107:17-22)."*  (Plaintiff's Facts, ¶ 20.)

whether he completed the Certification to excuse Plaintiff's absence from work, despite having numerous opportunities to do so in June 2005. (*Id. at 93:4-9, 102:11-15, 127:7-128:9*). Rather, Plaintiff assumed that Tri-Con had received the necessary paperwork. (*Id. at 99:19-100:3*).

32. Regardless, Plaintiff admits that the Certification contained no information to indicate that he needed an absence past June 21, 2005, that he was only certified to be absent from work until June 21, 2005, and that Tri-Con had no way of knowing that Plaintiff allegedly was not aware of the information contained in the Certification. (*Id. at 97:21-98:6, 100:4-20, 103:12-16*).

33. Plaintiff understood that Tri-Con could require him to provide additional certification from his doctor to approve an additional absence from work. (*Id. at 103:19-25*). Despite that understanding, Plaintiff fully admits that he never gave Tri-Con any additional certification, information, or notice to excuse his absence from work beyond June 21, 2005. (*Tri-Con Ex 9* [Filing 41-10]: *Plaintiff's Answers to Defendant's Requests for Admission, No. 13; Plaintiff Dep. at 104:1-5, 106:9-12, 108:2-20; Holt Aff., ¶17, 22*).

34. After Plaintiff's visit to Tri-Con with his father on June 8, 2005, Plaintiff failed to return to work on June 22, 2005, his designated return-to-work date. Nor did he return to or contact Tri-Con at any time before September 12, 2005 – well over three months past the commencement of his FMLA leave – despite having numerous opportunities to do so. (*Tri-Con Ex. 9, Nos. 12, 28, 29, and 30; Plaintiff Dep. at 106:14-25, 123:25-125:18, 107:11-14; Holt Aff., ¶22*).

35. When Plaintiff failed to return to work on June 22, 2005, Tri-Con attempted to reach Plaintiff by telephone at the home phone number designated by Plaintiff as a means to reach him if necessary, to inquire about Plaintiff's intent to return to work. (*Tri-Con Ex. 10* [Filing 41-11]: *Tri-Con's Phone Record for June 2005 (Plaintiff Dep. Ex. 13); Holt Aff., ¶18; Plaintiff Dep. at 114:6-115:17*). On June 22, 2005, at approximately 2:56 p.m., Shelley Holt, Tri-Con's former Human Resources Senior Coordinator, placed a telephone call to Plaintiff's

14

home phone number at the Seward Address. (*Tri-Con Ex. 10; Holt Aff., ¶18*). A young girl, most likely Plaintiff's younger sister, answered Ms. Holt's call. (*Holt Aff., ¶18; Plaintiff Dep. at 108:21-109:24*). When Ms. Holt asked for Plaintiff, she was told that he was not there or was unavailable. (*Holt Aff., ¶18*). Ms. Holt attempted to reach Plaintiff by phone on at least one other occasion, but was unable to reach him. (*Holt Aff., ¶19*).[27]

36. Plaintiff admits that Tri-Con placed a telephone call to the Seward Address on June 22, 2005, and that someone was home at the Seward Address all the time and thus would have received the telephone call from Tri-Con. (*Plaintiff Dep. at 110:23-111:4, 112:17-18, 115:10-17, 117:13-16, 121:8-11*). However, Plaintiff never returned any telephone calls to Tri-Con regarding his intent to return to work. (*Holt Aff., ¶18, 22*).

37. When Tri-Con received no response to its telephone calls to Plaintiff, Tri-Con prepared a letter dated June 24, 2005, notifying Plaintiff that it was seeking to determine Plaintiff's return status in accordance with Tri-Con's FMLA policy and FMLA regulations. (*Tri-Con Ex. 11* [Filing 41-12]*: Letter dated June 24, 2005, from Tri-Con to Plaintiff (Plaintiff Dep. Ex. 14); Holt Aff., ¶20*). Tri-Con noted in its letter that Plaintiff's most recent notice to Tri-Con stated that he would be able to return to work after June 21, 2005. Tri-Con's letter further stated that unless Plaintiff contacted Tri-Con by June 29, 2005, and provided an updated doctor's notice indicating a new return-to-work date, Tri-Con would terminate Plaintiff's employment on the basis of job abandonment. (*Id.*). Plaintiff admits that all of the information contained

---

[27] Svoboda states: "After June 22, 2005, Holt attempted to call Svoboda at his place of residence. *(Defendant Ex. 10: Tri-Con's Phone Record; Holt Dep. at 39:5-23)*. A young girl, most likely Svoboda's sister, answered the phone call. (*Holt Aff., ¶18; Svoboda Dep. at 108:21-109:24*) and said Svoboda was not there or unavailable. (*Holt Aff., ¶18*). Holt did not leave a message (*Holt Dep. at 39:12-13*); nor did the Svoboda household have caller ID (*Svoboda Dep. at 111:11-15*). Holt attempted to call Svoboda one more time, but was unable to reach him. *(Holt Dep. at 39:18-23)*. Svoboda did not even know Tri-Con had attempted to call him (*Svoboda Dep. 110:13-19*)."  (Plaintiff's Facts, ¶ 21.)

in Tri-Con's June 24, 2005, letter comported with his understanding of Tri-Con's FMLA policies in June 2005. (*Plaintiff Dep. at 118:10-120:4*).[28]

38. Tri-Con mailed the June 24, 2005, letter via certified mail to Plaintiff's Seward Address, the only address Plaintiff had given Tri-Con as a means to contact him if necessary. (*Id. at 39:22-40:16, 108:21-109:12, 118:10-15, 119:1-3, 120:5-121:11; Tri-Con Ex. 4, No. 3; Tri-Con Ex. 12* [Filing 41-13]*: Certified Mail cards for June 24, 2005 letter (Plaintiff Dep. Ex. 15); Holt Aff., ¶20*).[29]

39. Tri-Con's certified mail letter, which was correctly addressed to Plaintiff's Seward Address, was returned to Tri-Con, most likely because Plaintiff did not or would not sign for it. (*Holt Aff., ¶21*). Tri-Con attempted to mail the letter to Plaintiff several times,[30] but Tri-Con's efforts were unsuccessful. (*Plaintiff Dep. at 153:18-154:1*). Plaintiff claims he did not receive the letter until September 12, 2005,

---

[28] Svoboda states: "When Defendant could not get a hold [sic] of Svoboda over the telephone, a letter dated June 24, 2005 was prepared, notifying Svoboda that it was seeking to determine his return status. (*Defendant Ex. 11: Letter dated June 24, 2005, from Tri-Con to Svoboda; Holt Aff., ¶ 20). The letter also stated that if Svoboda was not to return to work or provide an updated doctor's notice indicating a new return-to-work date, by June 29, 2005, Svoboda's employment would be terminated. (*Defendant Ex. 11; Holt Aff., ¶20).*" (Plaintiff's Facts, ¶ 22.)

[29] Svoboda states: "Defendant mailed the June 24, 2005 letter via certified mail to Plaintiff's correct Seward Address. (*Svoboda Dep. at 39:22-40:16; Defendant Ex. 12: Certified Mail cards for June 24, 2005 letter; Holt Aff., ¶20). It was mailed on June 27, 2005. (*Svoboda Ex. 18* [Filing 46-4]*: Copy of return envelope addressed to Mike Svoboda from Tri-Con post marked June 27, 2005*)." (Plaintiff's Facts, ¶ 23.)

[30] Svoboda's deposition testimony does not establish that Tri-Con attempted to mail the letter to him several times. Svoboda testified that he called Tri-Con's HR department on September 12, 2005, and was told by Shelley Fulk [Holt] that Tri-Con had tried three times to send him a letter. (Filing 41-2, at 41.) Shelly Holt makes no mentions of multiple mailings in her affidavit; she only states that the letter was sent on June 24, 2005. (Filing 41-15, at 5-6.)

16

when he came to Tri-Con for the first time since commencing his FMLA leave. (*Id. at 118:10-25*).[31]

40. Plaintiff admits that "Tri-Con attempted to contact [him] via mail as well as by phone regarding [Plaintiff's intent] to return to work." (*Id. at 121:8-11*).

41. Plaintiff failed to contact Tri-Con, failed to provide an updated notice or certification excusing his absence from work, and failed to return to work. Tri-Con was at a loss for why Plaintiff would not return its calls, did not accept Tri-Con's certified letter, and did not return to work. (*Holt Aff., ¶¶21, 22*). Thus, Tri-Con terminated Plaintiff's employment on June 29, 2005, in accordance with the terms of its June 24, 2005 letter, and pursuant to its rights under the FMLA. (*Filing No. 1, ¶ 9; Holt Aff., ¶22*).[32]

---

[31] According to Svoboda, "Defendant's certified letter was returned to Tri-Con, because Svoboda was unable to sign for it. (*Holt Aff., ¶21*). Svoboda never received the letter, until September 12, 2005, when he visited Tri-Con. (*Svoboda Dep. at 153: 18-154:1*). The envelope containing the letter was intercepted by the U.S. Postal Service and forwarded to a different address. (*Svoboda Ex. 18*)." (Plaintiff's Facts, ¶ 24.)

The envelope actually indicates the letter, postmarked June 27, 2005, and addressed to "Mike Svoboda", was returned to Tri-Con on June 29, 2005. The post office appears to have affixed a label over the address that was typed on the envelope. The label reads:

SVOB718    684342008   1304   15   06/29/05
FORWARD TIME EXP      RTN TO SEND
SVOBODA MIKE LEE
825 SOUTH ST
SEWARD NE 68434-2443
              RETURN TO SENDER

(Filing 46-4, at 2.) Svoboda's first name is also shown as "Mike" on other exhibits.

[32] Svoboda states: "Defendant terminated Svoboda on June 29, 2005, well within the 12 weeks of FMLA leave (*Filing No. 1 ¶ 9; Holt Aff., ¶ 22*)." (Plaintiff's Facts, ¶ 25.)

17

42. In July 2005, Plaintiff learned about his termination from Tri-Con when he received a letter stating that his insurance with Tri-Con had been cancelled. (*Plaintiff Dep. at 121:12-122:13; Ex. 4, No. 10*).[33]

43. After receiving the July 2005 letter from his insurance company and learning he had been fired from Tri-Con, Plaintiff still did not contact Tri-Con. (*Plaintiff Dep. at 123:1-3*).

44. On August 4, 2005, while shopping with his mother at Shopko, Plaintiff ran into a co-worker from Tri-Con, who said he heard that Plaintiff had been fired and that Tri-Con had sent him a letter stating this. (*Tri-Con Ex. 13* [Filing 41-14]: *Plaintiff's Journal (Plaintiff Dep. Ex.16); Plaintiff Dep. at 125:21-126:23,134:5-136:7*). Plaintiff's co-worker also told Plaintiff that someone had tampered with Plaintiff's toolbox, which was worth about $2,000.00, and that Plaintiff should check it over before taking it home. (*Plaintiff Dep. at 139:19-140:7*). Despite being concerned to hear that someone had possibly broken into his toolbox, Plaintiff did not stop at Tri-Con to check on it. (*Id. at 140:8-13, 148:11-14*). Nor did Plaintiff contact or visit Tri-Con to determine whether he had been fired or whether Tri-Con had actually sent him a letter stating he had been fired. (*Id. at 140:17-141:17, 148:3-10*).

45. On August 13, 2005, Plaintiff received another letter from his insurance company stating that his insurance coverage had been cancelled because he had been terminated from Tri-Con. (*Id. at 144:9-145:9, 147:1-12*). After receiving this second letter, Plaintiff still never called Tri-Con to check on the status of his insurance. (*Id. at 146:17-20*).

---

[33] Svoboda admits that "[i]n late July of 2005, [he] received a letter from Tri-Con stating his insurance had been cancelled. (*Svoboda Dep. at 121: 12- 122:9; Ex. 4, No. 10*)." (Plaintiff's Facts, ¶ 27.)  However, Svoboda claims he "was not aware of the termination (*Svoboda Dep. at 136: 24; 137 at 1-2; 8;12*) and continued to believe he was protected under FMLA leave until he was medically cleared by his physician (*Svoboda Dep. at 149 at 2-16*)." (Plaintiff's Facts, ¶ 26.)  "Svoboda believed his insurance had been terminated, but not his employment; he assumed he still 'had a job lined up.' (*Svoboda Dep. at 123: 10-17*)." (Plaintiff's Facts, ¶ 28.)

18

46. Svoboda was physically in Lincoln and had the opportunity to visit Tri-Con to discuss his intent to return-to-work or to check on the status of his job (given that he knew he had been terminated) on eight occasions in July and August, 2005. (*Id. at 156:5-15*). Despite having multiple opportunities, Plaintiff did not contact or visit Tri-Con until September 12, 2005, when he called to check on the status of his job. (*Id. at 151:25-152:8*).[34]

47. During the summer of 2005, Plaintiff was represented by counsel with regard to a personal injury lawsuit stemming from his car accident earlier that summer and was instructed to keep a personal log of his daily activities. (*Id. at 125:21-126:23, 134:5-16*). Plaintiff admits that he made a conscious decision not to contact or visit Tri-Con until well after his FMLA leave expired in order to allow his FMLA leave to expire, to permit Tri-Con to terminate Plaintiff for failure to return to work, and to "bolster" his own personal injury lawsuit and damages claim. (*Id. at 134:5-18, 137:14-139:13; Tri-Con Ex. 13*).

48. On June 12, 2008, nearly three years after Tri-Con's termination of Plaintiff's employment for job abandonment, Plaintiff filed the instant lawsuit, alleging Tri-Con willfully violated Plaintiff's rights under the FMLA. (*Filing No. 1*).[35]

(Filing 40, at 3-13.)

## B. *Legal Analysis*

"Although the term 'willful' has not been defined expressly in the FMLA or by the Supreme Court, [the Eighth Circuit] determined in *Hanger v. Lake County*, 390

---

[34] Svoboda contends he "discovered he had been terminated on or around September 12, 2005, when [he] returned to Tri-Con (*Svoboda Dep. at 153: 18-154:1)*." (Plaintiff's Facts, ¶ 29.)

[35] Svoboda agrees he "filed this lawsuit on June 12, 2008, alleging Defendant willfully violated his rights under FMLA. (*Filing No. 1*)." (Plaintiff's Facts, ¶ 30.)

F.3d 579, 583 (8th Cir. 2004), that the Supreme Court's definition for 'willful' in the context of the Fair Labor Standards Act [(FLSA)] also applies to the term 'willful' under the FMLA.  Under that definition, the plaintiff must demonstrate the employer 'either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute.'  *Id.* (quoting *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)).  Such a standard recognizes an employer's general knowledge about the statute's potential applicability, by itself, fails to demonstrate willfulness.  Id. at 584."  *Samuels v. Kansas City Missouri School Dist.*, 437 F.3d 797, 803 (8th Cir. 2006).

Svoboda argues there was a willful violation because he "was entitled to 12 weeks leave" under the FMLA and Tri-Con knew that "firing an employee before his 12 weeks have expired is prohibited by the act."  (Filing 45, at 7, 8.)  This argument misstates the law.  Under the FMLA, "an eligible employee is entitled to *up to* twelve weeks of unpaid leave during a twelve-month period '[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 471 (8th Cir. 2007) ( quoting 29 U.S.C. § 2612(a)(1)(D)) (emphasis supplied).

"The FMLA was designed to protect, in relevant part, the reasonable medical needs of employees with serious health conditions within the limits set by the employer's legitimate interest in managing its business.  *See* 29 U.S.C. § 2601(a)(4), (b)(2), (b)(3); *Woods* [*v. DaimlerChrysler Corp.*, 409 F.3d 984, 991 (8th Cir.2005)].  As a means of balancing the employee's reasonable needs and the employer's legitimate interests, an employer may, upon receiving timely and adequate notice of an employee's possible incapacity, request a medical certification form stating

> (1) the date on which the serious health condition commenced; (2) *the probable duration of the condition*; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; . . . [and] [4] for purposes of leave [in the instant case], a

statement that the employee is unable to perform the functions of the position of the employee[.]"

*Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 786 (8th Cir. 2009) (quoting 29 U.S.C. § 2613(b)(1)-(b)(3), (b)(4)(B)) (emphasis supplied).

Dr. Ketner certified on June 9, 2005, that the probable duration of Svoboda's serious health condition was "at least through 6/21/05." (*See* footnote 24.) After receiving this information, Tri-Con took no immediate action to notify Svoboda that he was expected to return to work on June 22, 2005, even though the paperwork completed on June 8, 2005, gave the impression that Tri-Con had approved FMLA for up to 12 weeks. There is evidence Tri-Con attempted to notify Svoboda of this expected return date by phone and certified mail between June 22 and June 27, but it has not been conclusively shown that Svoboda received such notice before his employment was terminated on June 29, 2005.

Tri-Con claims in its reply brief that "[w]hen Plaintiff requested FMLA leave, he notified Tri-Con that his return to work would be based on his doctor's certification[,]" and that "the Certification completed by Plaintiff's doctor and submitted to Tri-Con only provided that the duration of Plaintiff's condition was through June 21, 2005." (Filing 48, at 5.) However, it is undisputed that Svoboda, when requesting FMLA leave on June 8, 2005, stated that "his return to work would be based on his doctor's *release*." (*See* paragraph 15 of material facts above (emphasis supplied).) The certification that Dr. Ketner completed on June 9, 2005, did not release Svoboda to return to work on June 22, 2005.[36]

Tri-Con's "Response for Family Leave" advised Svoboda that he could be required to furnish periodic reports of his status and intent to return to work, but no

_____

[36] Tri-Con's "Response for Family Medical Leave" even instructed Svoboda that he would be required to submit a separate "fitness-for-duty certificate" before returning to work.

such report was actually requested by Tri-Con until June 24 or June 27, 2005, when it sent a certified letter to Svoboda advising that "a doctor's notice indicating a new return to work date" needed to be received by June 29, 2005, and that "[i]f a valid doctor's note is provided stating your need to stay off work, you may be asked to provided [sic] an updated Certification of Health Care Provider form to determine if the leave still qualifies under FMLA." (Filing 41-12.) The evidence establishes that Svoboda did not receive this letter before his employment was terminated on June 29, 2005, and that Tri-Con learned of this fact when the letter was returned by the post office. While Tri-Con speculates that the letter was returned because Svoboda "did not or would not sign for it," the evidence suggests that no attempt at delivery was even made because the post office concluded that Svoboda was not residing at the address shown on the letter. There is no evidence Tri-Con attempted to contact Svoboda at the forwarding address shown on the post office's return label, but Svoboda has admitted the letter was mailed to the correct address. (*See* footnote 29.)

While a reasonable jury could find that Tri-Con violated the FMLA when it terminated Svoboda's employment on June 29, 2005, [37] it would not be reasonable to conclude that the violation was willful. Tri-Con may have blundered by assuming Svoboda knew that he was expected to return to work on June 22, 2005, but it made a good faith effort to contact him on and after that date in order to determine his status. Even if Tri-Con should have done more to notify Svoboda concerning his

---

[37] Tri-Con also argues: "It is undisputed that Plaintiff's leave commenced on May 24, 2005. It is also undisputed that Plaintiff did not return to or contact Tri-Con until September 12, 2005, approximately fifteen weeks after the commencement of his FMLA leave. . . . Plaintiff understood Tri-Con's FMLA policy and knew that he was only entitled to a maximum of twelve weeks of FMLA leave. Because Plaintiff failed to return to or contact Tri-Con until well after the expiration of his FMLA leave, Tri-Con properly terminated Plaintiff's employment in compliance with the FMLA. (Filing 40, at 15-16 (internal citations omitted; emphasis in original).) The difficulty with this argument is that it is undisputed Tri-Con terminated Svoboda's employment after only 5 weeks of FMLA leave.

return-to-work date, Svoboda's evidence is not sufficient to establish that Tri-Con terminated his employment with the knowledge it was violating the FMLA, or that it acted in reckless disregard of the law.

### III.  CONCLUSION

There are no genuine issues of material fact that the plaintiff's action is barred by the two-year statute of limitations.

Accordingly,


IT IS ORDERED that:

1.      The defendant's motion for summary judgment (filing 39) is granted.

2.      Judgment shall be entered by separate document.

December 16, 2009.                         BY THE COURT:

                                          *Richard G. Kopf*
                                          United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.